UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GEORGE ADAMIDIS, Independent
Administrator of the Estate of John
Adamidis,

        Plaintiff,

    v.

COOK COUNTY, et al.,

        Defendants.

No. 19 CV 7652

Judge Manish S. Shah

**MEMORANDUM OPINION AND ORDER**

The Cook County Sheriff's Department Police found Judy Glatz dead on her living-room couch, surrounded by bottles of pills. Officers learned that Glatz's Jeep was not in her parking space and asked nearby police departments to help find it. They also learned the name of John Adamidis from Glatz's brother. Skokie police officers quickly located the Jeep in Adamidis's driveway. Cook County officers and detectives arrived at the residence, placed Adamidis in handcuffs, told him he was "being detained," and took him to the police station for interrogation. Adamidis's detention lasted about three to four hours, and he was released without any charges filed against him. Adamidis filed suit against Cook County and several officers involved in his detention, alleging false arrest under 42 U.S.C. § 1983.[1]

---

[1] John Adamidis died on March 27, 2021. [80]. George Adamidis, John's brother and administrator of his estate, is now the plaintiff in this case. [85]. For readability, I refer to John Adamidis and "plaintiff" interchangeably in this opinion.

Defendants move for summary judgment under Federal Rule of Civil Procedure 56. The motions are denied. A jury could find that there was no probable cause to believe that Adamidis committed a crime, and factual disputes about who communicated the decision to seize Adamidis preclude a decision as a matter of law on defendants' qualified-immunity defense.

## I.     Legal Standards

Summary judgment is proper when there is no genuine dispute of any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). I construe all facts and reasonable inferences in favor of plaintiff, the nonmoving party. *Robertson v. Department of Health Services*, 949 F.3d 371, 377–78 (7th Cir. 2020). But the moving party is entitled to summary judgment when the nonmoving party fails to make "a sufficient showing on an essential element" of his case for which he has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Wade v. Ramos*, ---F. 4th---, No. 20-1241, 2022 WL 483155, at *4 (7th Cir. Feb. 17, 2022) (nonmovant's version of events must be "backed up by a measure of plausible evidence" in the record).

## II.     Background

On July 7, 2019, Cook County Sheriff's Officers David Ribaldo and Susano Viramontes arrived at Judy Glatz's apartment for an "ambulance assist." [88] ¶ 9.[2]

---

[2] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations to depositions, which use the deposition transcript's original page number. The facts are largely taken from plaintiff's response to defendants' Local Rule 56.1 statement, [88], and defendants' response to plaintiff's statement of additional material facts, [92], where both the asserted fact and the opposing party's response are set forth in one document.

They met Glatz's father outside the building, who told them that the apartment door was unlocked and open, and that Glatz was on the sofa—black and blue and unresponsive. [78] Ex. B, Ribaldo Body Worn Camera at 0:35–0:59. The officers entered the apartment, found Glatz's dead body on the living-room couch, notified dispatch that it would be a death investigation, and began to secure the scene. *Id.* at 1:29–1:49; [88] ¶¶ 12–13, 18, 24. Officers found multiple prescription-drug bottles on the table next to Glatz's body—some bearing the names of other people. [92] ¶ 15. But Ribaldo did not see any indication of forced entry or signs of violence. [92] ¶ 32.

Shortly thereafter, Officer Roger Guerra and Sergeant Steven Zepeda arrived. [88] ¶ 14. Ribaldo, Viramontes, and Zepeda examined the inside of Glatz's apartment. [88] ¶¶ 26–27.[3] Ribaldo told Zepeda that Glatz had cash in her hand, a purse underneath her, and that he found a bunch of pill bottles. [88] ¶ 20; [78] Ex. B,

---

[3] Defendants assert: "Officer Ribaldo found and examined the parts from the broken locking mechanism, which was sitting on the kitchen counter, purportedly from the broken parking lot entry door. Sgt[.] Zepeda pushes open the door to the apartment without pushing the knob, consistent with [a] broken locking mechanism." [88] ¶ 28. For support, they cite the body worn camera videos and depositions of Ribaldo and Zepeda. But this fact is disputed and neither video clearly shows a broken locking mechanism. At best, the state of the door's locking mechanism remains unclear, making an inference in favor of defendants improper at this stage. Ribaldo's video shows him standing at the counter, jingling something that sounds like metal. *See* [78] Ex. B, Ribaldo BWC at 8:24–8:53. But all Ribaldo's camera captures are the cabinets, dishes, and toaster in front of him—it does not reveal what is on the counter. *Id.* In fact, Zepeda's BWC shows the deadbolt intact, and captures what appear to be a receipt, a large keychain, and a pink screwdriver on the counter where Ribaldo stood. [78] Ex. D, Zepeda BWC at 6:41–7:03. Ribaldo testified that he was playing with a metal object he believed were parts of a lock, but he also qualified that he did not "remember exactly what was on there," and he did not recall telling anyone that the locking mechanism was a possible sign of forced entry or making such a note in a report. [75-7] at 49:14–50:5, 81:1–82:4. Finally, while Zepeda appears to have opened the apartment door without pushing or turning the doorknob, he arrived after Glatz's father, Ribaldo, and Viramontes had all already entered through the same door. Defendants' assertion that Zepeda's entry was "consistent with a broken locking mechanism" is just speculation.

3

Ribaldo BWC at 11:00–11:11. The cash was rolled up in a way that indicated it was being used to snort a substance. [88] ¶ 22.

In the parking lot, Glatz's father told Viramontes that his daughter's Jeep was not in her parking space; Viramontes contacted dispatch to help locate the vehicle. [88] ¶ 15; [78] Ex. C, Viramontes BWC at 5:55–6:24, 7:56–8:40. Glatz's father also told officers that to the best of his knowledge, the vehicle had been recently repaired, returned home, and then towed after Glatz was arrested. [92] ¶ 13. He further reported that he last communicated with Glatz on June 24 (two weeks earlier), that Glatz struggled with drugs, and that he had begged her to go to rehab. [88] ¶¶ 32–33; [92] ¶ 14. The officers started to develop a timeline of Glatz's death, and asked dispatch to run a criminal history check to see if Glatz had any history of drug or alcohol abuse. [88] ¶ 32.

After officers turned off their body cameras, Glatz's brother arrived on the scene to meet his father and told officers John Adamidis's name; officers ran the name through dispatch and learned Adamidis's physical description and address. [88] ¶¶ 36–37. At the same time, more investigators continued to arrive at the scene, including Sergeant Michael Dwyer, who took over the investigation after being debriefed. [88] ¶¶ 39–41.[4] Detective Sheryl Collins also arrived at the scene; officers

---

[4] Dwyer testified that he believed locating the Jeep could be significant because "the vehicle could have been taken in her death, there could be evidence of the death in the vehicle, there could be proceeds that could have been taken by force[, and] [t]here's a lot of questions that need to be answered." [88] ¶ 45. Plaintiff disputes this fact, focusing on Dwyer's testimony that he has no recollection of ever instructing anyone to question or take Adamidis into custody, or having probable cause to arrest him. [88] ¶ 45; [75-9] at 9:18–20, 10:1–22. But the two are not the same. "A response may not set forth any new facts, meaning facts that are not fairly responsive to the asserted fact to which the response is made." Local Rule 56.1(e)(2).

told her that Glatz's death was likely related to a drug overdose but no one indicated that any crime had been committed. [92] ¶ 8.

Cook County notified nearby police departments of the search for Glatz's Jeep and Skokie personnel quickly found it at Adamidis's residence in Morton Grove. [88] ¶¶ 47–49, 54. There was never any message that the Cook County Sheriff was looking for Adamidis or indicating that the vehicle was stolen. [88] ¶¶ 47, 56.[5] After finding the Jeep, Skokie Officer Shane Long's superior told him to stay at Adamidis's residence until Cook County officers showed up. [88] ¶ 55.

Back at Glatz's apartment, Dwyer told Detective Maureen Donohoe that Adamidis was a suspect in the death investigation and told her to bring Adamidis in for questioning; Collins also heard Dwyer say that Adamidis should be detained (though she did not know who Dwyer told). [88] ¶¶ 43, 46; [92] ¶ 9. Collins never heard Dwyer state that Adamidis was a suspect in any crime or explain why he should be brought in for questioning. [92] ¶ 8. But according to Collins and Donohoe, Dwyer instructed them to relocate to Adamidis's residence. [92] ¶¶ 9–10.

Skokie officers did not arrest Adamidis because they had very little information, it was not their case, and they were not aware of any reasons to do so. [92] ¶ 16. After Skokie and Morton Grove police arrived, Adamidis got out of his residence and approached the officers; according to Adamidis's testimony, Skokie

---

Dwyer's failure to recall these facts does not undermine his testimony that locating the vehicle might be significant.

[5] Adamidis would later testify that Glatz had parked her Jeep in his driveway with two flat tires approximately a week before her body was discovered. [92] ¶ 2. Body camera footage appears to confirm a flat front passenger tire. [78] Ex. E, Guerra BWC at 0:48–0:54.

officers told him to stop in the middle of the driveway and get on the ground. [88] ¶ 59. Collins told Skokie personnel that she wanted Adamidis taken into custody, and plaintiff was handcuffed. *Id*.; [92] ¶ 16.[6] When Donohoe, Collins, and Guerra arrived at Adamidis's residence, Skokie officers turned Adamidis over to Cook County custody. [88] ¶¶ 61, 63.[7]

Guerra placed Adamidis in handcuffs. [88] ¶¶ 64, 69; [92] ¶ 22.[8] Guerra's body worn camera indicates Adamidis was handcuffed for at least thirteen minutes before being placed in a squad car (still handcuffed). [92] ¶ 17; [78] Ex. E, Guerra BWC. During that time, Adamidis was cooperative and did not refuse to answer any questions or comply with any instructions. *Id*.

Early on, Adamidis asked Guerra if he could get his medicine from the house; Guerra said "I'm going to take care of that in one second for you" and led Adamidis over to Collins and two other officers. [78] Ex. E, Guerra BWC at 0:50–0:58. Collins questioned Adamidis about his medications, and Guerra suggested that Adamidis tell

---

[6] It's unclear who originally handcuffed Adamidis. Adamidis testified that Skokie police handcuffed him in the driveway before Cook County officials arrived. [75-11] at 36:11–37:23, 38:10–13, 43:5–13. Skokie Officer Shane Long, however, testified that no one placed Adamidis under arrest or detained him before the Cook County Sheriff's department handcuffed him. [75-18] at 12:8–13:2, 43:6–22. Guerra further muddies the waters; he testified that he replaced handcuffs from Morton Grove and placed Cook County handcuffs on Adamidis. [75-15] at 7:19–22.

[7] Skokie and Morton Grove personnel did not provide any information that influenced Collins's or Donohoe's decision to detain Adamidis. [92] ¶ 12.

[8] Defendants assert that Guerra switched out handcuffs to place Cook County handcuffs on Adamidis, an assertion plaintiff does not contest. [88] ¶ 64. And Guerra's body camera video appears to show Guerra handing a Skokie officer a set of handcuffs as he fastens other handcuffs on Adamidis. [78] Ex. E, Guerra BWC at 0:03–0:06. Yet as discussed in Note 6, the record is unclear regarding which department—Skokie, Morton Grove, or Cook County—first handcuffed Adamidis.

the officers where the medication was so they could escort Adamidis's father into the house to retrieve it. [78] Ex. E, Guerra BWC at 1:04–1:54. Adamidis then asked Guerra and Collins if he was under arrest, to which Guerra responded: "Right now, sir, you are being detained, and we're going to transfer you over while you get, uh, for our investigation." [78] Ex. E, Guerra BWC at 1:54–2:02; [88] ¶ 65. Collins nodded along and said, "Detained. Yeah." [78] Ex. E, Guerra BWC at 1:57–2:01.

Several minutes later, Adamidis again asked officers what was going on. [78] Ex. E, Guerra BWC at 6:52–6:57. Collins replied, "You are being detained as the officer earlier told you, ok? Then we are going to take you to our office and follow up, ok?" [78] Ex. E, Guerra BWC at 6:58–7:06. Collins then asked Adamidis whether he had any identification; Adamidis said it was right inside and he could show her where. [78] Ex. E, Guerra BWC at 7:08–7:15. Adamidis then told officers "I'm not going to go nowhere," to which Collins responded: "I know you're not going anywhere, but you can't go back in the house. So can your dad bring, can you like tell me where it is? Because if not, we'll just take you and fingerprint you for positive I.D., that's not a problem." [78] Ex. E, Guerra BWC at 7:16–7:27.

After a few more minutes, Guerra walked Adamidis from the driveway to a squad car down the street and placed him in the backseat. [78] Ex. E, Guerra BWC at 10:40–12:51. None of the officers asked Adamidis about Glatz, why Glatz's vehicle was parked in his driveway, or whether he would voluntarily travel to police headquarters for questioning. [92] ¶ 18. Donohoe and Collins informed Guerra that

Adamidis would be taken to the Cook County Sheriff's facility in Maywood, Illinois, for further questioning. [92] ¶ 23.

Donohoe and Collins transported Adamidis—still in handcuffs—to the Maywood station for questioning regarding the Glatz death investigation and his possession of the Jeep. [88] ¶¶ 68, 70; [92] ¶ 25. Guerra stayed behind to handle the tow of the Jeep. [88] ¶ 68. About an hour and a half after being handcuffed in his driveway, Adamidis arrived at police headquarters, where Donohoe placed him in locked room for questioning. [92] ¶¶ 24, 26. Dwyer assigned Detective Robert Lobacz[9] to interview Adamidis. [92] ¶ 30. Dwyer and Collins told Lobacz that there was a death investigation of a woman (Glatz) who had potentially died of a drug overdose and whose vehicle was found in front of Adamidis's house; they also told Lobacz that there was no sign of a break-in at Glatz's apartment. [88] ¶ 71; [92] ¶ 30. Collins and Lobacz then questioned Adamidis, who signed a waiver of his Miranda rights, did not ask for an attorney, and answered all of their questions. [88] ¶¶ 72–74; [92] ¶ 28.[10] Adamidis told Collins and Lobacz that he had a relationship with Glatz, that her car was the one in his driveway, and that he had previously seen Glatz use drugs. [88] ¶ 74. After two to three hours, detectives ended the interview and drove Adamidis home. [88] ¶¶ 73–74. From the time he was placed in handcuffs outside his residence

---

[9] Plaintiff dropped his claims against Lobacz in the third amended complaint. [55].

[10] Adamidis testified that officers did not read him his *Miranda* rights and that he felt like he had no choice but to sign the waiver. [75-11] at 58:16–59:7. To resolve defendants' motions for summary judgment, it is immaterial whether officers read Adamidis his rights or whether Adamidis voluntarily and knowingly waived those rights. The issue is whether Cook County officers unlawfully seized him, and the *Miranda*-related issues do not bear on that question.

until his interrogation ended at the station, Adamidis was detained for approximately three to four hours total. [88] ¶ 76; [92] ¶ 33. He was never booked, put in a holding cell, fingerprinted, or charged with any crime. [88] ¶ 77. The investigation never became a homicide investigation—Glatz's death was designated an accidental drug overdose. [92] ¶¶ 1, 31.

Collins, Guerra, Donohoe, and Dwyer knew: (1) Glatz was dead; (2) Glatz's vehicle was at Adamidis's residence; and (3) Glatz was not with the vehicle. [88] ¶ 66.[11] None of the officers had any information suggesting that Glatz's vehicle had been stolen, and Guerra's tow report did not indicate that the vehicle had been stolen. [92] ¶¶ 4, 25. Donohoe and Collins did not have any other information about Adamidis and testified that their supervisor Dwyer made the call to detain him. [88] ¶¶ 43, 46; [92] ¶¶ 9, 21. Guerra, for his part, testified that he handcuffed Adamidis at the direction of Collins and Donohoe, and that the detectives made the decision to take Adamidis into custody, which Collins and Donohoe dispute. [92] ¶¶ 22–23.

Adamidis sued Dwyer, Collins, Donohoe, and Guerra under 42 U.S.C. § 1983, alleging that his seizure violated the Fourth Amendment.[12] Defendants move for summary judgment.

---

[11] Defendants also assert that they knew Dwyer wanted Adamidis to be brought in for questioning, but this fact is disputed. Dwyer testified that he could not recall ever instructing anyone to question or arrest Adamidis, or whether there was probable cause to arrest Adamidis. *See* [75-9] at 9:18–10:22, 17:21–18:7. Dwyer testified repeatedly that he could not recall any details regarding the decision to detain plaintiff and was not aware of anything that could refresh his recollection. *Id.*; [92] ¶¶ 3–6.

[12] Cook County is also a defendant, for indemnification purposes. *See* [55] ¶¶ 51–53.

## III.    Analysis

Defendants move for summary judgment on two grounds. First, they say that they had probable cause to arrest Adamidis. Second, they argue that they are entitled to qualified immunity.

### A.    False Arrest

Section 1983 authorizes suits against officers who violate constitutional rights while acting under color of state law. *See* 42 U.S.C. § 1983. The Fourth Amendment, applicable to the states through the Fourteenth Amendment, prohibits unreasonable seizures, including arrests lacking probable cause. *See Bailey v. United States*, 568 U.S. 186, 192–93 (2013); *see also Sow v. Fortville Police Dep't*, 636 F.3d 293, 301 (7th Cir. 2011). To prevail on his false-arrest claim, Adamidis "must show that there was no probable cause for his arrest." *Neita v. City of Chicago*, 830 F.3d 494, 497 (7th Cir. 2016).

### 1.    *Adamidis's Detention Required Probable Cause*

Dwyer contests whether Adamidis was arrested within the meaning of the Fourth Amendment.[13] He does not dispute that Adamidis was seized; rather, Dwyer contends that Adamidis's detention amounted to an investigatory stop under *Terry v. Ohio*, 392 U.S. 1 (1968), requiring only reasonable suspicion. Handcuffing Adamidis and taking him to the police station for hours of questioning, Dwyer argues, "is not

---

[13] Defendants Guerra, Collins, and Donohoe do not dispute that Adamidis's detention required probable cause, although they elide the remainder of the operative phrase: probable cause to "believe that the suspect had committed a crime." *Cibulka v. City of Madison*, 992 F.3d 633, 638 (7th Cir. 2021) (citation omitted); *see* [74] at 2, 10–11 (arguing defendants had "probable cause to detain [Adamidis] and bring him in for questioning" without basing such cause on any crime).

sufficient, on its own, to reasonably conclude it constituted an arrest." [72] at 6. Dwyer also emphasizes that officers handcuffed Adamidis during transport for safety purposes, told Adamidis that he was only being detained (not under arrest), and questioned him for only as much time as necessary to determine whether he was involved in Glatz's death.

Officers may conduct brief investigatory stops "if they reasonably suspect that an individual has committed or is about to commit a crime." *Torry v. City of Chicago*, 932 F.3d 579, 587 (7th Cir. 2019). Reasonable suspicion is a lower threshold than probable cause. *See United States v. Wilson*, 963 F.3d 701, 703 (7th Cir. 2020) (reasonable suspicion is "more than a hunch but less than probable cause"). "Subtle, and perhaps tenuous, distinctions exist between a *Terry* stop, a *Terry* stop rapidly evolving into an arrest[,] and a *de facto* arrest." *United States v. Tilmon*, 19 F.3d 1221, 1224 (7th Cir. 1994). For a *Terry* stop to "pass constitutional muster, the investigation following it must be reasonably related in scope and duration to the circumstances that justified the stop in the first instance so that it is a minimal intrusion on the individual's Fourth Amendment interests." *United States v. Reedy*, 989 F.3d 548, 552 (7th Cir. 2021) (citation omitted). While there is no bright-line time limit, a stop that lasts unreasonably long becomes an arrest and must be supported by probable cause. *See id.* at 552–53.

This was not a *Terry* stop. While "certain seizures may be justified on something less than probable cause," neither the Supreme Court nor the Seventh Circuit have ever "sustained against Fourth Amendment challenge the involuntary

11

removal of a suspect from his home to a police station and his detention there for investigative purposes ... absent probable cause or judicial authorization." *See Kaupp v. Texas*, 538 U.S. 626, 630 (2003) (quoting *Hayes v. Florida*, 470 U.S. 811, 815 (1985)). Here, officers handcuffed Adamidis in front of his home, did not allow him to re-enter his residence, asked no questions and gathered no information to dispel their suspicions, removed him from his property, and involuntarily transported him to the police station for hours of questioning. Even if he were detained at the station only briefly and for investigative purposes, "such seizures, at least where not under judicial supervision, are sufficiently like arrests to invoke the traditional rule that arrests may constitutionally be made only on probable cause." *Hayes*, 470 U.S. at 816.

Further, that officers told Adamidis he was being "detained" rather than arrested does not matter. *See Dunaway v. New York*, 442 U.S. 200, 212–13 (1979) ("The mere facts that petitioner was not told he was under arrest, was not 'booked,' and would not have had an arrest record if the interrogation had proved fruitless, while not insignificant for all purposes … obviously do not make petitioner's seizure even roughly analogous to the narrowly defined intrusions involved in *Terry* and its progeny.") Nor is it significant that officer safety allegedly motivated the decision to transport Adamidis in handcuffs. *See Kaupp*, 538 U.S. at 632 ("The test is an objective one … and stressing the officers' motivation of self-protection does not speak to how their actions would reasonably be understood."). The undisputed material facts show that officers arrested Adamidis, triggering the Fourth Amendment's probable-cause requirement.

2.     *Probable Cause*

The next question is whether the undisputed material facts compel a finding that defendants had probable cause to arrest Adamidis. Probable cause is an absolute defense to a false-arrest claim under the Fourth Amendment and § 1983. *See Farnik v. City of Chicago*, 1 F.4th 535, 545 (7th Cir. 2021) (quoting *Muhammad v. Pearson*, 900 F.3d 898, 907 (7th Cir. 2018).

"Probable cause is a common-sense inquiry requiring only a probability of criminal activity; it exists whenever an officer or a court has enough information to warrant a prudent person to believe criminal conduct has occurred." *Young v. City of Chicago*, 987 F.3d 641, 644 (7th Cir. 2021) (quoting *Whitlock v. Brown*, 596 F.3d 406, 411 (7th Cir. 2010)). The probable-cause determination hinges on the elements of the underlying criminal offense. *See Neita*, 830 F.3d at 497; *see also Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 761 (7th Cir. 2006) ("Whether an officer has probable cause to arrest depends on the requirements of the applicable state criminal law."). The subjective motivations of the arresting officer are immaterial. *See Gibbs v. Lomas*, 755 F.3d 529, 537 (7th Cir. 2014) (quoting *Jones v. City of Elkhart, Ind.*, 737 F.3d 1107, 1114 (7th Cir.2013)). Instead, an officer has probable cause to arrest a suspect only "when, given the totality of the circumstances, a reasonable officer would believe that the suspect had committed a crime." *Cibulka v. City of Madison*, 992 F.3d 633, 638 (7th Cir. 2021) (citation and quotation marks omitted).

Defendants invoke the collective knowledge doctrine, which holds that an officer may arrest a suspect at the direction of another officer "even if the officer

himself does not have firsthand knowledge of facts that amount to the necessary level of suspicion to permit the given action." *United States v. Street*, 917 F.3d 586, 596 (7th Cir. 2019) (quoting *United States v. Williams*, 627 F.3d 247, 252–53 (7th Cir. 2010)). For the collective knowledge doctrine to apply, "(1) the officer taking the action must act in objective reliance on the information received, (2) the officer providing the information—or the agency for which he works—must have facts supporting the level of suspicion required, and (3) the stop must be no more intrusive than would have been permissible for the officer requesting it." *Williams*, 627 F.3d at 252–53. The collective knowledge doctrine "is not an end around" the probable-cause requirement; the officer or agency providing the relied upon information must still have probable cause to justify the arrest. *See United States v. Khan*, 937 F.3d 1042, 1052 (7th Cir. 2019); *see also Whiteley v. Warden, Wyoming State Penitentiary*, 401 U.S. 560, 568 (1971) ("[A]n otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest.").

Defendants highlight several facts to argue that they had probable cause to arrest Adamidis. They knew (1) Glatz was dead in her apartment, surrounded by bottles of prescription pills and clutching a rolled-up dollar bill in her hand; (2) Glatz's Jeep was not in her parking spot; (3) Glatz's brother provided officers Adamidis's name; and (4) the Jeep was parked in Adamidis's driveway. Dwyer believed, based on these facts, that Adamidis could have been involved with the illegal drugs at the apartment, stolen Glatz's vehicle, or caused her death.

But a reasonable jury could find that the officers' collective suspicion of Adamidis amounted to nothing more than speculation. There are no facts, for example, indicating that anyone other than Glatz caused her own death, let alone connecting Adamidis to the death. Officers found no signs of violence or struggle, there was never a homicide investigation, and a jury could infer from Zepeda's body camera and Lobacz's testimony that there was no problem with the lock or signs of break-in at Glatz's apartment. *See* [92] ¶¶ 30–31; [78] Ex. D, Zepeda BWC at 6:41–7:03.[14] And while officers knew that Glatz had struggled with drug addiction, they had no evidence connecting Adamidis to the drugs in Glatz's apartment or the cause of her death.[15]

A jury could reasonably infer, moreover, that the presence of Glatz's Jeep in Adamidis's driveway was not evidence of a crime that Adamidis committed. Glatz's father told officers that the vehicle had been repaired, returned to Glatz's parking space, and then towed by police after she was arrested. No one told the police that they believed the vehicle had been stolen, and no evidence in the record suggests that

---

[14] All defendants contend that there were signs of forced entry into the apartment. But whether there was a broken lock or any other signs of forced entry, and whether those facts would support probable cause, are questions for the jury. *See Rooni v. Biser*, 742 F.3d 737, 740 (7th Cir. 2014) ("The probable cause determination must be made by a jury if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them." (citation and quotation marks omitted)).

[15] Guerra, Collins, and Donohoe say that officers "learned Plaintiff and Judy both had a history of drug use" and that officers shared this information with one another. [74] at 5. To support this assertion, defendants cite ¶ 32 of their statement of facts, which states in its entirety: "[Glatz's father] told Officer Ribaldo that Judy had a problem with drugs and that he begged her to go to rehab, but she did not go, and the officers asked dispatch to run a [criminal history check], a criminal history, to help determine if Judy Glatz had any history of drug use or alcoholism." [75] ¶ 32. This fact does not support a finding that officers learned that Adamidis had a history of drug use.

Adamidis's unlawfully possessed the vehicle. Dwyer believed the Jeep was relevant to the investigation, and defendants argue that they had a lot of questions, so bringing Adamidis in for questioning was the "only way" their questions could be answered. [74] at 11. But officers could have questioned Adamidis at his home or asked him to voluntarily come to the station for questioning. They also could have attempted to search the vehicle to confirm their suspicions. Defendants were not authorized, however, to arrest Adamidis based on a hunch about what might be in the Jeep. Drawing all inferences in plaintiff's favor, a reasonable jury could conclude that officers lacked probable cause to believe Adamidis had committed a crime.

Defendants also have not identified what crime supplied the foundation of their alleged probable cause. "Whether an officer is authorized to make an arrest ordinarily depends, in the first instance, on state law." *See Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979). "Federal law asks only whether the officers had probable cause to believe that the predicate offense, as the state has defined it, has been committed." *Williams v. Jaglowski*, 269 F.3d 778, 782 (7th Cir. 2001). Defendants here simply list several Illinois statutes for the first time in their reply briefs. *See* [91] at 5 n.3 (citing 720 ILCS 5/9-3.3 (drug-induced homicide), 720 ILCS 5/9-3.4 (concealment of a homicidal death), 720 ILCS 570/402 (illegal possession of a controlled substance); 720 ILCS 570/406.2 (unauthorized possession of a prescription form)); [93] at 7 (same).

These arguments are waived for two independent reasons. First, it is well settled that "arguments raised for the first time in [a] reply brief are waived because

they leave no chance to respond." *White v. United States*, 8 F.4th 547, 552 (7th Cir. 2021); *see also Wonsey v. City of Chicago*, 940 F.3d 394, 398 (7th Cir. 2019). Second, defendants simply list these statutes without any analysis or application to the facts of this case. Such perfunctory and undeveloped arguments provide independent grounds for waiver. *See M.G. Skinner & Assocs. Ins. Agency, Inc. v. Norman-Spencer Agency, Inc.*, 845 F.3d 313, 321 (7th Cir. 2017). Even looking past the waiver issue, a jury could reasonably conclude that officers lacked probable cause to believe plaintiff was involved in any homicide or possessed any illegal drugs or prescription forms.

Probable cause to arrest requires more than suspicion that *someone* may have committed some unidentified crime. Officers must have an articulable factual basis to believe that *the suspect* committed a crime. *See Cibulka*, 992 F.3d at 638. A reasonable jury could find that defendants did not have one here.

### 3. *Dwyer's Personal Involvement*

Finally, Dwyer contends that there is no evidence that he was personally involved in Adamidis's arrest. A government official is liable under § 1983 only for his or her own personal involvement in a constitutional violation. *See Taylor v. Ways*, 999 F.3d 478, 493 (7th Cir. 2021). To hold a supervisor like Dwyer liable, plaintiff must show Dwyer knew about the conduct and facilitated, approved, condoned, or turned a blind eye to it. *See Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017); *Matthews v. City of E. St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012).

There is evidence in the record from which a jury could infer that Dwyer knew of plaintiff's arrest and facilitated, approved, or condoned it. Donohoe testified that

Dwyer told her to go to "go to [Adamidis's] house in Morton Grove to pick up a suspect." [92] ¶ 10. Collins testified that Dwyer told her and other officers to relocate from Glatz's apartment to Adamidis's residence, and she personally heard Dwyer state that Adamidis "should be detained." [92] ¶ 9. And critically, Lobacz testified that Dwyer assigned him to interview Adamidis at the station, and that Dwyer and Collins told him that it was part of the death investigation. [92] ¶ 30. A trier of fact could reasonably infer from these facts that Dwyer's involvement throughout Adamidis's detention facilitated or approved his arrest, transport, and interrogation.

## B. Qualified Immunity

In § 1983 suits, officers are entitled to qualified immunity unless: "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quotation marks omitted); *Taylor v. City of Milford*, 10 F.4th 800, 806 (7th Cir. 2021). This common-law doctrine aims "[t]o strike a balance between addressing constitutional injuries committed by state actors and limiting the costs of section 1983 suits." *Est. of Davis v. Ortiz*, 987 F.3d 635, 638 (7th Cir. 2021). When a government official invokes qualified immunity at summary judgment, "the burden shifts to the plaintiff to defeat the defense by showing (1) that a trier of fact could conclude that the officer violated a federal right, and (2) that the unlawfulness of the conduct was clearly established at the time the officer acted." *Ortiz*, 987 F.3d 638–39.

Plaintiff has done so. A trier of fact could conclude that the defendants arrested Adamidis without probable cause in violation of his Fourth Amendment rights. And

the constitutional right to be free from arrest without probable cause was clearly established before Adamidis's arrest. *See, e.g. Humphrey v. Staszak*, 148 F.3d 719, 725 (7th Cir. 1998) (citing *Baker v. McCollan*, 443 U.S. 137 (1979) and *Gerstein v. Pugh*, 420 U.S. 103 (1975)). As was the more specific right to be free from involuntary detention for custodial interrogation without probable cause. *See Kaupp*, 538 U.S. at 630–32; *Hayes*, 470 U.S. at 815–16; *Dunaway*, 442 U.S. at 216.

Still, defendants would be entitled to qualified immunity if they arguably had probable cause to arrest Adamidis. That is, even if they lacked probable cause, defendants would be immune from suit "if a reasonable officer in their position could mistakenly have believed that probable cause existed." *Jones v. Clark*, 630 F.3d 677, 684 (7th Cir. 2011).

But unresolved issues of material fact preclude a finding that any defendant had arguable probable cause to seize Adamidis. A jury, for example, could find that Dwyer ordered Donohoe and Collins to pick up Adamidis as a "suspect" and "bring him to the station for questioning." [92] ¶¶ 10–11. Both Donohoe and Collins testified that Dwyer made the call to take Adamidis into custody. [92] ¶¶ 10–11, 21. Dwyer was also involved in advising Adamidis's questioners once he arrived at the station. Based on the facts in record, a jury could find that Dwyer was personally involved in the arrest and lacked even arguable probable cause to suspect Adamidis had committed a crime. As plaintiff acknowledges, *see* [90] at 28, if a jury concludes that Donohoe, Collins, and Guerra were simply acting on another officer's orders, they may be entitled to qualified immunity on the basis that they reasonably believed

19

there was probable cause. *See United States v. Villegas*, 495 F.3d 761, 770 (7th Cir. 2007) (absent reason to believe otherwise, officer is entitled to deem reliable the information received fellow officer); *United States v. Parra*, 402 F.3d 752, 764 (7th Cir. 2005) (officers effecting an arrest need not know all facts that constitute probable cause when they reasonably act at the direction of another officer).

Yet it is not clear from the record that Collins and Donohoe were acting at the direction of Dwyer when they took Adamidis into custody. There was no documentation of Dwyer ordering officers to take Adamidis into custody, and Dwyer testified that he had no recollection of giving the order and would have expected such an order to be documented. *See* [92] ¶¶ 3, 11. A jury might believe Dwyer that he did not cause the arrest and simply ordered detectives to relocate to Adamidis's residence. [92] ¶ 10. Indeed, while Collins says she heard Dwyer say that Adamidis should be detained, she does not recall who Dwyer said this to, and she never heard Dwyer state that Adamidis was a suspect in a crime. [92] ¶¶ 8–9. If Collins and Donohoe arrested plaintiff without Dwyer directing them to do so, then they would not be entitled to qualified immunity. Similarly, Guerra testified that he handcuffed Adamidis at the direction of Collins and Donohoe, but Donohoe testified that she did not instruct Guerra to do so, and Collins claimed to have no knowledge of what led to Adamidis being placed in handcuffs. [92] ¶ 22.

In short, the record is unsettled on what Dwyer told Collins and Donohoe, and in turn, what Collins and Donohoe told Guerra. These factual gaps preclude a finding that any defendant reasonably believed there was probable cause to arrest Adamidis.

Drawing all reasonable inferences in favor of Adamidis, a jury could find that the defendants violated Adamidis's clearly established constitutional rights by making a full-scale arrest without probable cause.

## V.    Conclusion

The motions for summary judgment, [71] and [73], are denied.

ENTER:

_____
Manish S. Shah
United States District Judge

Date: February 23, 2022